UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA

MINNESOTA LAWYERS MUTUAL
INSURANCE COMPANY,

                       CASE NO.  15-2008
               Plaintiff,

    v.

GALLAGHER, LANGLAS &
GALLAGHER, P.C.,
TIMOTHY C. BOLLER, E.J.
GALLAGHER III, EDWARD J.
GALLAGHER, JR., LINDA A. JENSEN
HALL, THOMAS W. LANGLAS,
DOMINIC PECHOTA, KAREN L.
THALACKER, THOMAS C.
VERHULST, GEORGE L. WEILEIN,
MELISSA M. TIMMERMANS, and
BRENT J. HEEMSKERK, Fiduciary of
the Estate/Conservatorship of DAVID
A. ROTH

               Defendants.

## COMPLAINT FOR DECLARATORY JUDGMENT INCLUDING REQUEST FOR RESCISSION OF INSURANCE POLICY

Pursuant to 28 U.S.C. §§ 2201 and 2202, Plaintiff Minnesota Lawyers Mutual Insurance Company ("MLM") brings this action for declaratory judgment and further relief including a request for rescission of an insurance policy, and states and alleges the following against Defendants Gallagher, Langlas & Gallagher, P.C. ("GLG"), Timothy C. Boller, E.J. Gallagher III, Edward J. Gallagher, Jr., Linda A. Jensen Hall, Thomas W. Langlas, Dominic Pechota, Karen L. Thalacker, Thomas C. Verhulst, George L. Weilein, Melissa M. Timmermans, and Brent J. Heemskerk, the Fiduciary of the Estate/Conservatorship of David A. Roth:

# I. PARTIES, JURISDICTION AND VENUE

1.      An actual controversy has arisen and now exists between the parties relating to the rights and obligations as to any duty to defend and indemnify under MLM Policy No. 4716-19 ("the Policy"), which was issued by MLM to NAMED INSURED, GLG, and named Timothy C. Boller, E.J. Gallagher III, Edward J. Gallagher, Jr., Linda A. Jensen Hall, Thomas W. Langlas, Dominic Pechota, Karen L. Thalacker, Thomas C. Verhulst, George L. Weilein, Melissa M. Timmermans, and David A Roth as individual INSUREDS.  MLM requests a declaration of its rights as more fully averred below, including its request for rescission of the Policy.

2.      MLM is a Minnesota mutual insurance company with its principal place of business in Minneapolis, Minnesota, and is authorized by  Iowa Code 515.12 and 515.48(5)(b) to sell insurance policies in Iowa.

3.      Defendant GLG is a law firm and professional corporation organized under the laws of the State of Iowa and with its principal place of business located at 405 E. 5th Street, Waterloo, Iowa.

4.      Upon information and belief, Defendants Timothy C. Boller, E.J. Gallagher III, Edward J. Gallagher, Jr., Linda A. Jensen Hall, Thomas W. Langlas, Dominic Pechota, Karen L. Thalacker, Thomas C. Verhulst, George L. Weilein, and Melissa M. Timmermans are each individual citizens of the State of Iowa, and were each employed as attorneys of GLG, and, as individual insureds identified in the Policy, have been added as additional party defendants to answer as to their respective interests, if any, as to MLM's request for declaratory relief including rescission of the Policy.

5.     Brent J. Heemskerk is the Fiduciary of the Estate/Conservatorship of David A. Roth, Probate No. ESPR060144, pending in the Iowa District Court for Black Hawk County. David A. Roth was an individual citizen of the State of Iowa, and was employed as an attorney of GLG.  Because David A. Roth was an individual insured identified in the Policy, Brent J. Heemskerk, the Fiduciary of the Estate/Conservatorship of David A. Roth, has been added as additional party defendant to answer as to his interest, if any, as to MLM's request for declaratory relief including rescission of the Policy.

6.     This is an action for declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between MLM and the Defendants, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.  The Court may enter Declaratory Judgment pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57.

8.     This Court has personal jurisdiction over Defendant GLG because its principal place of business is in the state of Iowa.  This Court has personal jurisdiction over Defendants Timothy C. Boller, E.J. Gallagher III, Edward J. Gallagher, Jr., Linda A. Jensen Hall, Thomas W. Langlas, Dominic Pechota, Karen L. Thalacker, Thomas C. Verhulst, George L. Weilein, Melissa M. Timmermans and remaining Defendants because they are domiciled in the state of Iowa.  This Court has personal jurisdiction over Brent J. Heemskerk, the Fiduciary of the Estate/Conservatorship of David A. Roth because the Estate of David A Roth is has been opened and is pending the District Court for Black Hawk County, Iowa.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside in the district and because a substantial part of the events or omissions giving rise to this cause of action occurred in the district.

### III.  FACTUAL ALLEGATIONS

10.     MLM provides professional liability insurance to attorneys and law firms.

11.     MLM's policies are "claims-made" policies. Claims-made policies differ from occurrence policies in that under a claims-made policy, known claims must be reported during the policy period or reporting time period window as defined by the policy, whereas with occurrence policies, claims may be reported indefinitely into the future if the "occurrence" giving rise to the claim occurred during the policy period.

12.     By providing yearly periods of coverage during which known claims must be reported, claims-made policies allow insurers to more accurately estimate risk based upon an insured's claims history and the current claims climate, which often allows insurers to offer lower rates than could be offered for an occurrence policy.

13.     Because claims-made policies generally cover clams which are made during the policy period, even if the professional services giving rise to the claim occurred prior to the policy period, insurers issuing claims-made policies must rely on their insureds' representations about known claims or known incidents that could result in claims being made in order to assess the risk in underwriting the policy and in order to set the premium.

14.     GLG has purchased multiple claims-made policies from MLM, each having a defined policy period and each issued pursuant to its own application process. The first MLM policy was issued to GLG in 1995.

15.     At all times pertinent to this action, David Roth ("Roth") was an attorney and the managing general partner of GLG.

16.     In all of Roth's communications with MLM as described herein, he was acting as an authorized representative of GLG.

4

17.     The Policy at issue in this case is MLM Policy No. 4716-19, issued to GLG as the "NAMED INSURED" with effective dates of October 1, 2013 to October 1, 2014. The Policy provided a limit of liability of $4,000,000 per claim, subject to a $5,000,000 annual aggregate. A $15,000 deductible applied to each claim. (See attached exhibit 1, the Policy)

18.     Prior to issuing the Policy, MLM required GLG to complete a Renewal Update Application and a Request to Issue.

19.     Roth submitted the Renewal Update Application (the "Application") to MLM electronically on October 30, 2013, and submitted a Request to Issue (the "Request to Issue") dated November 6, 2013.  (See attached exhibit 2, the Application; and exhibit 3, the Request to Issue)  The Application was attached to the Policy when it was issued.

20.     The Application, in Question 4, asks the following:

> In the past 12 months:
> a.  Have any malpractice CLAIMS been made against any member of the firm?
> b.  Has any firm member become aware of any INCIDENT which could reasonably result in a claim being made against the firm or a member of the firm?

21.     In response to questions 4(a) and 4(b), Roth answered "no."

22.     Roth's answers to Questions 4(a) and 4(b) were false.

23.     In reality, Roth had in the prior twelve months become aware of CLAIMS and/or INCIDENTS which could reasonably result in claims being made against the firm or a member of the firm.

24.     The Application, in Question 3, asks the following:

> Have there been any changes to the information provided in the firm's most recent application or addendums to the application*? *(e.g., office systems, procedures, additional/deleted lawyers, etc.)

25.     Roth selected "No, the information previously provided to MLM is still correct."

5

26.     Roth's statement was false.

27.     In signing and submitting GLG's most recent prior application on September 21, 2012 (the application for the policy effective 10/1/2012 to 10/1/2013), Roth had checked the clause certifying the following:

> **The undersigned further certifies that there have been no other significant changes to the previously submitted application information and is not aware of any claims or circumstances that could reasonably result in claims or disciplinary actions that have not been reported to Minnesota Lawyers Mutual.**
> (emphasis in original)

28.     In reality, on September 21, 2012, Roth was aware of CLAIMS or INCIDENTS which could reasonably result in claims being made against the firm or a member of the firm, which CLAIMS and INCIDENTS had not been reported to MLM.

29.     The Application, in Question 7, asks:

> In the past 5 years has any attorney proposed for this insurance engaged in any business other than the practice of law while also practicing law <u>which was not previously disclosed on a prior application?</u> (Do <u>not</u> include "teaching", "property leasing" or "farming")
> (emphasis in original)

30.     In response to question 7, Roth answered "no."

31.     Roth's answer to Question 7 was false.

32.     In reality, Roth had been engaged in providing financial planning and investment services for some years, whereby he would offer to invest clients' money, often as inducement promising higher rates of return than the clients were receiving in their current investments.

33.     Roth's engagement in investment business had never been disclosed to MLM in a prior application.

34.     The Application further provides:

> After you read this section, you will be asked to certify that the answers contained herein are true, correct and complete to the best of your

6

knowledge and belief, and that the information contained in this application is true, and that no facts have been suppressed or misstated. You are also confirming the fact that this application is being submitted by an authorized representative of the law firm.

35.     The Application further provides:

By act of entering this information and submitting this application, the submitting party is signing this application. The signature below is made by the person indicated, not someone else on their behalf. All rights and responsibilities accorded a physical signature will be considered to hold. The submission of this application does not bind Minnesota Lawyers Mutual Insurance Company (The Company) to issue a policy or the application to purchase the insurance.

36.     The Application further provides:

I certify that reasonable inquiry has been made within the firm to assure the accuracy of all information contained herein.

37.     The Application further provides:

I understand that failure to report any known claims or potential claims, or other material information may result in the declination of coverage or policy rescission.

38.     Roth electronically signed and submitted the Application to MLM on October 30, 2013. In so doing, he certified the correctness of the information contained in the Application and his agreement with the Application's terms and confirmed he was submitting the Application as an authorized representative of the law firm.

39.     Roth's false representations in the Application were material.

40.     In submitting the Application, Roth intended to induce MLM to issue the Policy, and intended to induce MLM to issue the Policy on terms favorable to GLG.

41.     In reasonable reliance on the material information contained in the Application, MLM issued a premium quote offering to provide coverage under the listed terms conditioned on

premium payment and the return of the executed Request to Issue, which contained the following statement:

> By accepting this quotation, the undersigned certifies that there have been no significant changes in practice or any information contained in the previously submitted application(s). The undersigned further certifies that the undersigned is not aware of any claims or circumstances that could result in claims or disciplinary actions that have not been reported to Minnesota Lawyers Mutual Insurance Company. If this is not the case, the undersigned will provide immediate written notification to Minnesota Lawyers Mutual Insurance Company before accepting the quotation.

42.     Roth signed the Request to Issue on November 6, 2013 and submitted the Request to Issue to MLM.

43.     Roth's certification in the Request to Issue was false.

44.     Roth's false certification in the Request to Issue was material.

45.     By signing and submitting the Request to Issue, Roth intended to induce MLM to issue the Policy, and intended to induce MLM to issue the Policy on terms favorable to GLG.

46.     In reasonable reliance on the information contained in the Application and the Request to Issue, MLM accepted the premium payment and issued the Policy.

47.     On September 23, 2014, Roth committed suicide.

48.     Subsequent to Roth's death and prior to the end of the reporting period under the Policy, GLG reported numerous claims to MLM.

49.     MLM has reserved its rights with respect to coverage on a claim-by-claim basis, and has further reserved its right to seek rescission of the Policy.

50.     Subsequent to Roth's death, MLM has learned that since 2006 Roth had maintained a secret bank account at Veridian Credit Union in Waverly, Iowa  (the "Veridian Account") in the name of GLG, about which the other members of GLG reportedly had no knowledge. The Veridian Account was not designated as an attorney trust account by Veridian

8

Credit Union. Roth apparently used the Veridian Account in order to further a scheme to misappropriate client funds and to make payments on the structured settlements he had established for various clients, among other uses.

51.     At the time of Roth's death, the Veridian Account had a balance of $14,399.08.

52.     Roth was aware of multiple CLAIMS or INCIDENTS which could reasonably result in claims as of October 30, 2013 when he submitted the Application to MLM.  Upon information and belief, examples of such CLAIMS or INCIDENTS which could reasonably result in claims against GLG, but were not disclosed by Roth to MLM include, but are not limited to the following:

   a.   On February 6, 2012, Roth transferred $24,500 in funds held in trust by GLG on behalf of Roth's client Ronald Hurst into the Veridian Account. The funds originated from a settlement of a personal injury case, and were to be used to satisfy one or more subrogation interests. Upon information and belief, Roth failed to use the money to satisfy the subrogation interest(s).

   b.   On May 29, 2013, Roth transferred $12,700 in funds held in trust by GLG on behalf of Roth's client Colleen Franzen into the Veridian Account. The funds originated from a settlement of a personal injury case, and were to be used to satisfy one or more subrogation interests. Upon information and belief, Roth failed to use the money to satisfy the subrogation interest of State Farm Insurance Company in the amount of $8,325.00.

   c.   In 2006 and 2007, Roth represented Joshua Stockdale in a Black Hawk County criminal case. Upon information and belief, Roth advised Stockdale to plead guilty and advised Stockdale that the guilty plea would not result in a

requirement to register as a sex offender. In fact the offense was one which required registration. Upon information and belief, when Stockdale confronted Roth about the mistaken advice in the Summer of 2013, Roth offered to settle the legal malpractice claim for $50,000, and promised to make payments over the following five years. He made payments to Stockdale of $15,000 in June 2013 and $10,000 in July of 2013, and failed to make any additional payments.

d.  On or about August 29, 2012, upon information and belief, Roth forged the signature of his client Melissa Tabor to endorse a settlement check issued by GEICO Indemnity Insurance Company made payable to Melissa Tabor and GLG, in an amount of $39,915.15. He then converted the funds for his own personal use by depositing the check into the Veridian Account. On or about June 21, 2013, upon information and belief, Roth forged the signature of his client Melissa Tabor and her husband David Tabor to endorse a check issued by Progressive Universal Insurance Company made payable to Melissa Tabor and David Tabor, and David Roth, in an amount of $20,000. He then converted the funds for his own personal use by depositing the check into the Veridian Account.

e.  In 2012, Roth agreed to represent James Farnsworth in a criminal case. Farnsworth's parents, James and Robyn Farnsworth, paid Roth $75,000 in May of 2012. Upon information and belief, Roth represented to James and Robyn Farnsworth that the money was the refundable retainer. Instead of holding the money in trust, however, on May 17, 2012, Roth deposited the

$75,000 check directly into the Veridian Account, thus converting the funds for his own personal use. He thereafter sent monthly invoices to James and Robyn Farnsworth. James and Robyn Farnsworth made five more payments of $3,000 toward payment of the monthly invoices. One of the monthly invoices included a $5,000 expense payment to "Natural Plus," which Roth represented was for a martial arts expert to testify at trial. The martial arts expert was never used, however, and it is believed that "Natural Plus" is the name of a plant nursery and landscaping business in Clear Lake. In 2014, Roth represented to the Farnsworths that "plenty" of money remained on their retainer, and he wrote an $8,000 check to James Farnsworth so that the family could pay real estate taxes. The remainder of the retainer was never refunded.

f.  On March 26, 2013, Roth deposited a $33,000 settlement funds check related to his client Joann Moon's personal injury case into the Veridian Account. Upon information and belief, he was to have withheld funds from the settlement for payment of subrogation interests. Upon information and belief, Roth failed to use the money to satisfy the subrogation interests of Wellmark Blue Cross and Blue Shield and Safeco Insurance Company of America. Upon information and belief, Joann Moon may not have received the money due to her from the settlement.

g.  In 2012, Roth represented Nick and Terie McNamara in a personal injury case. Upon information and belief, Roth settled the case in October 2012 without his clients' permission. Upon information and belief, on or about October 3, 2012, a check in the amount of $20,000 was issued from AMCO

Insurance Company made payable to Terie McNamara, Nick McNamara, and GLG, and subsequently deposited directly into the Veridian Account. Upon information and belief, all or a portion of the $20,000 was improperly withheld from Nick and Terie McNamara's settlement proceeds and thus converted by Roth.

h. On August 29, 2013, Roth settled client Lydia Freeman's worker's compensation case. Roth represented that $46,000 of the settlement proceeds would be held in trust by GLG so that $40,000 could be used to pay down Ms. Freeman's mortgage, and $6,000 could be used for future medical payments. Upon information and belief, Roth converted the $46,000 for his own personal use.

i. In 2010 and 2011, Roth represented Jeffrey McKelvie in a Black Hawk County criminal case. Upon information and belief, Roth advised Mr. McKelvie that if he pled guilty, he would only have to register as a sex offender for two years. In reality, the plea required indefinite registration. Mr. McKelvie pled guilty in March 2011. Upon information and belief, Roth knew that there was no limitation on the registration and lied to Mr. McKelvie.

j. In 2009, Roth settled a personal injury case for his client Carmen Moore. Upon information and belief, Roth knowingly failed to satisfy subrogation interests with the settlement proceeds.

k. In 2011, Roth represented Wanda Hesse in a personal injury case. Upon information and belief, Roth settled the case in 2011 without his client's knowledge or signature. Upon information and belief, on or about February 9,

12

2011, a check in the amount of $23,000 was issued from State Farm Mutual Automobile Insurance Company made payable to Wanda Hesse and GLG, and subsequently deposited directly into the Veridian Account. Upon information and belief, all or a portion of the $23,000 was improperly withheld from Wanda Hesse's settlement proceeds and thus converted by Roth. Upon information and belief, Roth knowingly failed to satisfy subrogation interests with the settlement proceeds.

l.  In 2011, Roth settled a personal injury case for his client DeeAnn Fairman. Upon information and belief, Roth knowingly failed to satisfy subrogation interests with the settlement proceeds.

m.  In 2011, Roth represented William Timp and R.T. in a settlement. $15,000 of the funds from the settlement was withheld to be placed in a conservatorship. Upon information and belief, Roth never established or funded the conservatorship. Upon information and belief, Roth knowingly failed to satisfy subrogation interests with the settlement proceeds.

n.  In the Fall of 2013, Roth advised Jennie Waller regarding the life insurance proceeds that were due to her minor daughters arising out of Ms. Waller's husband's death totaling $374,452.83. Roth advised that since the money was owed to Ms. Waller's minor daughters, a conservatorship would need to be established, and that she should sign the insurance proceeds checks over to GLG, and that he would hold the money in trust, establish the conservatorships, and then transfer the money into the conservatorships. Upon

13

information and belief, Roth never established or funded the conservatorships and instead converted the money to his own personal use.

o.  In 2009, Roth represented Amie Kurz on behalf of a minor, in the settlement of a personal injury case. Upon information and belief, Roth withheld $65,000 from the settlement proceeds which was to be put into a conservatorship and used to purchase an annuity. Upon information and belief, Roth never funded the conservatorship or purchased the annuity.

p.  In April of 2013, Roth represented Tina Crow, as conservator for J.S., in the settlement of a personal injury case.  Upon information and belief, Roth withheld $13,000 from the settlement proceeds which was to be put into a conservatorship for Ms. Crow's minor daughter and used to purchase an annuity. Upon information and belief, Roth never funded the conservatorship or purchased the annuity.

q.  In December of 2012, Roth represented Ashley Herreid Welsh in the settlement of a personal injury case. Upon information and belief, Roth withheld $55,069 from the settlement proceeds which was to be put into a conservatorship for Ms. Welsh's minor daughter and used to purchase an annuity. Upon information and belief, Roth never funded the conservatorship or purchased the annuity.

r.  Roth represented VerJean and Eugene Walther in a personal injury case. Upon information and belief, the case settled in December 2012 in an amount of $1,200,000.  Upon information and belief, Roth advised the Walthers that GLG could provide a structured settlement for their portion of the settlement

proceeds, and the Walthers agreed to such investment. Upon information and belief, Roth thereafter failed to provide the scheduled structured settlement payments to the Walthers.

s.   In October 2010, Roth settled a personal injury case for his client Michelle Mundt. Upon information and belief, Roth advised Ms. Mundt that GLG could provide a structured settlement for her portion of the settlement proceeds, and Ms. Mundt agreed to such investment. Thereafter, Roth provided various payments to Ms. Mundt from the Veridian Account pursuant to the structured settlement terms.

t.   Roth represented Kelly Krieger in the settlement of a personal injury action in approximately 2008. Upon information and belief, Roth advised Ms. Krieger that GLG could provide a structured settlement for her portion of the settlement proceeds, and Ms. Krieger agreed to such investment. Thereafter, Roth provided various payments to Ms. Krieger from the Veridian Account pursuant to the structured settlement terms.   Upon information and belief, Roth knowingly failed to satisfy the $28,000 outstanding subrogation interest with the settlement proceeds.

u.   Roth represented Ryan and Heather Peterson in the wrongful death claim for their minor son's death. Upon information and belief, the claim settled in December 2011. The Petersons claim that Roth represented to them that the settlement was in a gross amount of $750,000.   Upon information and belief, Roth advised the Petersons that GLG could provide a structured settlement for their portion of the settlement proceeds, and the Petersons agreed to such

investment. Thereafter, Roth provided various payments to the Petersons from the Veridian Account pursuant to the structured settlement terms. The Petersons claim that allocation of a portion of the settlement proceeds was artificial, and that that they entitled to additional monies and interest thereon. Additionally, upon information and belief, no annuity or structured settlement was purchased for A.P. and Roth allegedly misappropriated the $20,000 that was to be paid to or for the benefit of A.P. Further, upon information and belief, no annuity or structured settlement was purchased for T.P. and Roth allegedly misappropriated the $24,900 that was to be paid to or for the benefit of T.P.

v. In 2011, Roth settled a legal malpractice case for his client John Youngblood. Upon information and belief, Roth advised Mr. Youngblood that GLG could provide a structured settlement for his portion of the settlement proceeds, and Mr. Youngblood agreed to such investment. Thereafter, Roth provided various payments to Mr. Youngblood from the Veridian Account pursuant to the structured settlement terms.

w. Roth represented Dan Adams in a matter arising from injuries sustained in a physical altercation. Upon information and belief, the matter settled and on or about October 21, 2009, a check in the amount of $10,000 was issued from Claims Management Inc. made payable to Daniel Adams and GLG, and subsequently deposited directly into the Veridian Account. Upon information and belief, all or a portion of the $10,000 was improperly withheld from Dan Adams' settlement proceeds and thus converted by Roth.

x.   Roth represented Sylvia Hernandez in a workers' compensation matter. Upon information and belief the matter settled and on or about February 11, 2013, a check in the amount of $5,513 was issued from ESIS Insurance Company made payable to Sylvia Hernandez c/o GLG, and subsequently deposited directly into the Veridian Account. Upon information and belief, all or a portion of the $5,513 was improperly withheld from Sylvia Hernandez's settlement proceeds and thus converted by Roth.

y.   Roth represented Lynne Zellhoefer in a matter arising from an automobile accident. Upon information and belief, the matter settled and on or about June 29, 2012, a check in the amount of $9,000 was issued from Farmers Insurance made payable to Lynne Zellhoefer and GLG, and subsequently deposited directly into the Veridian Account. Upon information and belief, all or a portion of the $9,000 was improperly withheld from Lynne Zellhoefer's settlement proceeds and thus converted by Roth.

z.   Roth represented Christine Wharff in a slip and fall matter. Upon information and belief, the matter settled and on or about August 8, 2012, a check in the amount of $10,000 was issued from Cincinnati Insurance Company made payable to Christine Wharff and GLG, and subsequently deposited directly into the Veridian Account. Upon information and belief, all or a portion of the $10,000 was improperly withheld from Christine Wharff's settlement proceeds and thus converted by Roth.

aa.  Roth represented Otis Walton in a workers' compensation and personal injury matter. The personal injury claims were dismissed and the workers'

compensation claim settled. Upon information and belief, on or about September 7, 2012, a check in the amount of $13,500 was issued from West Bend made payable to Otis Walton and Fontella Walton, and GLG, and subsequently deposited directly into the Veridian Account. Upon information and belief, all or a portion of the $13,500 was improperly withheld from Otis Walton's settlement proceeds and thus converted by Roth.

bb. Roth represented Chris Bentzin in a workers' compensation matter. Upon information and belief, the matter settled and or about February 23, 2011, a check in the amount of $24,003 was issued from Liberty Mutual made payable to GLG, Chris Bentzin, and David Roth, and subsequently deposited directly into the Veridian Account. Upon information and belief, all or a portion of the $24,003 was improperly withheld from Chris Bentzin's settlement proceeds and thus converted by Roth.

cc. Roth represented Amber Deutsch and Andrew Warner in a matter arising from a motorcycle accident. The matter was settled and dismissed. On or about December 7, 2010, a check in the amount of $8,474 was issued from Western Agriculture Insurance Company made payable to Andrew Warner, David Roth, and GLG, and deposited directly into the Veridian Account. On or about December 7, 2010, a check in the amount of $5,956 was issued from Western Agriculture Insurance Company made payable to Amber Deutsch, David Roth, and GLG, and deposited directly into the Veridian Account. Upon information and belief, all or a portion of the $8,474 and $5,956 was

improperly withheld from Amber Deutsch's and Andrew Warner's settlement proceeds and thus converted by Roth.

53.     Had MLM been advised of the claims or potential claims as described in paragraph 52, MLM would not have issued the Policy.

54.     As of October 30, 2013, Roth had on multiple occasions in the preceding five years engaged in a "business other than the practice of law while also practicing law." Namely, he had provided investment advice and services. Upon information and belief, examples of engagement in such investment service business, none of which were disclosed by Roth to MLM, include, but are not limited to, the following:

a.     Roth represented VerJean and Eugene Walther in a personal injury case. Upon information and belief, the case settled in December 2012 in an amount of $1,200,000.  Upon information and belief, Roth advised the Walthers that GLG could provide a structured settlement for their portion of the settlement proceeds, and the Walthers agreed to such investment. Upon information and belief, Roth thereafter failed to provide the scheduled structured settlement payments to the Walthers.

b.     In 2012, Edward Delau, based upon Roth's advice, provided $25,000, purportedly as an interest-bearing loan to John J. Gilder, the purported executor of the estate of a minor, for use in the process of pursuing causes of action arising out of the minor's death on behalf of the estate. Upon information and belief, John J. Gilder does not exist and Roth falsified the loan document. Roth converted the funds to his own use by depositing them in the secret Veridian Account on April 5, 2012.

19

c. Sometime prior to June 2013, Roth accepted $100,000 from Edward Delau as an investment, purportedly to be invested in a case captioned <u>Cox v. Mid-American Energy, et. al</u>. The investment was to have a 12% rate of return and was to be re-invested in other litigation cases after resolution of the <u>Cox</u> case. Upon information and belief, Roth converted the $100,000 to his own personal use.

d. In October 2010, Roth settled a personal injury case for his client Michelle Mundt. Upon information and belief, Roth advised Ms. Mundt that GLG could provide a structured settlement for her portion of the settlement proceeds, and Ms. Mundt agreed to such investment. Thereafter, Roth provided various payments to Ms. Mundt from the Veridian Account pursuant to the structured settlement terms.

e. Roth represented Kelly Krieger in the settlement of a personal injury action in approximately 2008. Upon information and belief, Roth advised Ms. Krieger that GLG could provide a structured settlement for her portion of the settlement proceeds, and Ms. Krieger agreed to such investment. Thereafter, Roth provided various payments to Ms. Krieger from the Veridian Account pursuant to the structured settlement terms.

f. Roth represented Ryan and Heather Peterson in the wrongful death claim for their minor son's death. Upon information and belief, the claim settled in December 2011. The Petersons claim that Roth represented to them that the settlement was in a gross amount of $750,000. Upon information and belief, Roth advised the Petersons that GLG could provide a structured settlement for

their portion of the settlement proceeds, and the Petersons agreed to such investment. Thereafter, Roth provided various payments to the Petersons from the Veridian Account pursuant to the structured settlement terms. The Petersons claim that allocation of a portion of the settlement proceeds was artificial, and that that they entitled to additional monies and interest thereon.

g.  In early 2013, Roth presented Brent Hanlin with an opportunity to invest in GLG's litigations, which was to pay 12% interest. Upon information and belief, Mr. Hanlin invested $110,000 and was later paid back $69,200 pursuant to the investment terms. Roth failed to pay back the remainder of the investment.

h.  In 2010, Roth persuaded Angie Bixby-Ellerman to invest $11,670.93 with the firm on behalf of her minor son. Upon information and belief, Roth converted the money for his own personal use.

i.  In January 2011 and times before and after, upon information and belief Roth was providing investment services to Christy Drake, apparently in her position as trustee of the DrakePorter Trust.

j.  In 2011, Roth settled a legal malpractice case for his client John Youngblood. Upon information and belief, Roth advised Mr. Youngblood that GLG could provide a structured settlement for his portion of the settlement proceeds, and Mr. Youngblood agreed to such investment. Thereafter, Roth provided various payments to Mr. Youngblood from the Veridian Account pursuant to the structured settlement terms.

55. Had MLM been advised of Roth's provision of investment services as described in paragraph 54, MLM would not have issued the Policy.

56. On February 12, 2015, MLM offered GLG mutual rescission of the Policy on the basis of misrepresentation or fraud made by or with the knowledge of the insured GLG in obtaining or renewing the Policy, and MLM further offered GLG a return of the premium MLM received from GLG with respect to the Policy. On February 13, 2015, GLG declined mutual rescission and declined a return of the premium MLM received from GLG with respect to the Policy. Accordingly, contemporaneously with the filing of its Complaint for Declaratory Judgment, MLM has filed a motion to tender the full amount of the premium it received from GLG with respect to the Policy. If the Court enters an order granting MLM leave to deposit funds with the Clerk of this Court, MLM will tender a check for deposit with this Court in the amount of $38,726.00, the full amount the premium, in order to return the contracting parties to the *status quo* before the Policy was issued.

## COUNT I: EQUITABLE RESCISSION

57. Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 56 of this Complaint.

58. Roth, as an authorized representative of GLG, made representations in the Application and Request to Issue.

59. The representations made by Roth with respect to knowledge of claims or incidents that could reasonably result in claims were false.

60. The representation made by Roth with respect to the prior year's application containing correct information was false.

61. The representation made by Roth with respect to insureds engaging in "business other than the practice of law while also practicing law," was false.

62. The foregoing representations made by Roth were material.

63. The foregoing representations were provided by Roth with the intent to induce MLM to act, namely, to induce MLM to issue the Policy.

64. MLM justifiably relied on the foregoing representations in issuing the Policy.

65. Had MLM been aware of the information that it now knows, including but not limited to the information set forth in paragraphs 52 (a-cc) and 54 (a-j), at the time Roth made representations in the Application and Request to Issue, MLM would not have issued the Policy.

66. Based upon the foregoing, MLM is entitled to equitable rescission of the Policy.

WHEREFORE, Plaintiff Minnesota Lawyers Mutual Insurance Company respectfully requests judgment be entered against Defendant GLG as follows:

1. For a declaration that the Policy is rescinded.

2. For Plaintiff's costs, disbursements and attorneys' fees.

3. For amounts paid on behalf of GLG and expenses incurred under MLM Policy No. 4716-19.

4. For amounts paid by MLM for losses incurred including, but not limited to, amounts paid under MLM Policy No. 4716-19.

5. Any further relief which the court may deem appropriate.

Respectfully Submitted,

/s/  Kevin J. Driscoll
Kevin J. Driscoll- #AT0002245
Eric G. Hoch- #AT0003486
FINLEY, ALT, SMITH, SCHARNBERG,
CRAIG, HILMES & GAFFNEY, P.C.
699 Walnut Street, Ste 1900
Des Moines, IA 50309
Telephone:  515-288-0145
Facsimile:   515-288-2724
E-mail:  kdriscoll@finleylaw.com
            ehoch@finleylaw.com
ATTORNEYS FOR PLAINTIFF MINNESOTA
LAWYERS MUTUAL INSURANCE COMPANY